JONES, Justice
(dissenting).
This case is before the Court upon a petition for writ of certiorari. I would reverse the judgment of the Court of Civil Appeals. Petitioner Robert Allen Williams filed suit against the respondent Illinois Central Gulf Railroad Company (“ICG”) based on negligence under the Federal Employers’ Liability Act, 45 U.S.C. § 51 et seq. (FELA). The railroad denied liability and claimed that Williams was contribu-torily negligent. The case was submitted to a jury, and the jury returned a general verdict in favor of Williams in the amount of $1. The trial court entered judgment upon the verdict. Thereafter, Williams filed a motion for new trial based on a *441 claim of inadequate damages. The trial court denied the motion, and on appeal the Court of Civil Appeals affirmed the judgment.
The Court of Civil Appeals concisely set forth the operative facts:
“Williams was employed as a head brakeman with ICG at the time of his injury. At approximately 10 P.M. on December 4, 1985, Williams was attempting to ‘throw’ a track switch (a heavy steel device used to allow trains to move from one track to another). After Williams had unlocked the track switch, he grabbed the handle of the switch and attempted to turn or ‘throw’ the switch. When he pulled on the handle, Williams’s hands slipped off and he fell backwards. After he fell, Williams noticed grease covering his gloves and the switch handle.
“Williams completed his work for the night and prepared an accident report. On the report the cause of the accident was listed as ‘handle on switch was heavily greased.’ Further, the report stated that the equipment was defective ‘because of excessive grease on handle of switch.’ The record also indicates that the handle was hard to turn.
“The record further reveals testimony that the grease on the handle was not the type the railroad used to lubricate switches and that the switch appeared to have been vandalized.”
Williams’s evidence revealed the resulting injuries, including a ruptured interver-tebral lumbar disc and an aggravation of a pre-existing pilonidal cyst. Undisputed special damages were shown to be in excess of $30,000.
It is the uniform jurisprudence in this state that a jury’s verdict, where supported by the evidence, is presumed to be accurate, and should not be disturbed on the grounds of inadequate damages, unless the amount is so inadequate as to clearly show that the verdict was the result of mistake or of prejudice, passion, or some other improper motive. This presumption is strengthened when the trial court refuses to grant a motion for new trial. In reviewing the trial court’s decision to grant or to deny a motion for new trial on the grounds of inadequate damages, however, we must ascertain whether the verdict is consistent with the preponderance of the evidence. Carter v. Reid, 540 So.2d 57 (Ala.1989).
At the outset, it should be mentioned that the FELA supplants state laws with a uniform system of remedial rules, which govern railroad workers’ claims against their employers. Specifically, it provides railroad employees an exclusive remedy against their employers for injuries resulting from their employers’ negligence. In re Second Employer’s Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912). The courts have liberally construed the FELA so as to facilitate its objectives. Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). See, also, Richter and Foer, Federal Employers’ Liability Act — A Real Compensatory Law for Railroad Workers, 36 Cornell L.Q. 203 (1951). In order to ensure uniformity, federal law must take precedence over state law. “This is a necessary conclusion if uniformity is to be achieved, considering the fact that state and federal courts have concurrent jurisdiction to entertain FELA suits. 45 U.S.C. § 56.” Ex parte Burlington Northern R.R., 470 So.2d 1094, 1096 (Ala.1985). See, also, Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d §§ 3526, 3527 (1984).
From its inception in 1908, the FELA has embraced a comparative negligence standard. The FELA provides, however, that, although contributory negligence “shall not bar a recovery,” it may be used to diminish damages in “proportion to the amount of negligence attributable to such employee.” 45 U.S.C. § 53 (1982).
The question whether a jury instruction on contributory negligence is proper depends on the facts of each individual case. “A defendant is entitled to such an instruction to the jury if there is any evidence to support that theory.” Meyers v. Union Pacific R.R., 738 F.2d 328, 331 (8th Cir.1984). Correspondingly, in an FELA case, the burden of proving contributory negligence rests squarely on the railroad.
*442 “[If] no evidence is presented from which a jury could properly find a lack of due care by a plaintiff, then it is generally fundamental error for the [trial] court to give a contributory negligence instruction, and a plaintiff is entitled to a new trial.”
Wilson v. Burlington Northern, Inc., 670 F.2d 780, 782 (8th Cir.1982), cert. denied, 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982).
As stated in the Court of Civil Appeals’ opinion:
“ICG’s contributory negligence defense was based on Williams’s failure to discover grease on the handle of the switch before he attempted to throw it. ICG introduced evidence that Williams had a duty imposed by railroad rules to examine the switch before he attempted to throw it.”
The question whether the alleged rule violation was admissible to show contributory negligence turns on the corresponding question whether the rule was general or specific in its terms. Atchison, T. & S.F. Ry. v. Ballard, 108 F.2d 768 (5th Cir.1940), cert. denied, 310 U.S. 646, 60 S.Ct. 1096, 84 L.Ed. 1413 (1940). Unfortunately, the rule in question is not included in the record. It should be pointed out, however, that, if the rule was merely a perfunctory reminder of caution, it should not have been submitted to the jury for the purpose of proving contributory negligence. Nevertheless, it is not on this point that I disagree with the judgment of af-firmance by the Court of Civil Appeals. I agree that the contributory negligence issue was properly submitted to the jury and that the jury was properly instructed on the comparative negligence doctrine and its concommitant “reduction of damages” principle.
ICG contends that there was substantial evidence from which the jury could have found that Williams’s negligence was the proximate cause of his injuries in a greater proportion than was ICG’s alleged negligence. Even if we accept this conclusion, the validity of the jury verdict in favor of the plaintiff and an award of $1 is still a viable issue. It is on this point that I differ with the Court of Civil Appeals’ holding that, under the facts of this case, the verdict for the plaintiff and an award of $1 is not an inconsistent verdict as a matter of law.
The evidence tends to show that vandali-zation of switch handles and other railroad equipment was not encountered by the railroad employees on a regular basis. Williams testified that he had never encountered grease on a switch handle in his 20-plus years as a railroad employee. It should also be mentioned that, with the exception of the “inspection” issue, Williams’s method of throwing the switch was not contested.
Aubrey Pollen, who had been a railroad conductor since 1960 and who was Williams’s supervisor, testified:
“Q Would you expect [Williams] that evening to go out and inspect that handle to see if it had grease on it?
“A No, sir.”
On recross-examination, Mr. Pollen was asked:
“Q Mr. Pollen, are you saying you don’t expect the men that work under you to inspect equipment or just look at it before they use it, even though that’s in the safety rules, the operating rules, as you said, common sense?
“A Well, certainly everybody would look at something before they attempted to do it. But as far as it depends on the situation. I mean, if — you don’t go out and inspect every switch before you throw it if you got X amount of switches to throw, or so forth and so on. If you encounter the danger, then is when you do something about it.”
Williams testified as follows:
“Q At this point where was the engine, where was the locomotive engine?
[[Image here]]
“A 15 or 20 [feet back].
“Q And what about his headlight, did he have it on dim or bright?
“A Had it on bright.
*443 “Q What part, if any, did that play in your ability to [see] what you were doing, sir?
“A When I was unlocking the switch? “Q Yes, sir.
“A The headlight was blinding me.
“Q It was coming from your right side? “A Yes, sir.
“Q Did you ever see any grease on this [handle]?
“A I did not.”
Boyd Sims, a section foreman who had the responsibility of maintaining the track and switches in the area of the accident, testified that the switch operated normally on the morning after Williams’s accident. Sims, a railroad employee with over 24 years’ experience, further testified on direct examination:
“Q Did you get a report of Mr. Williams being injured out at that switch?
“A The next morning, yes, sir.
[[Image here]]
“Q How did you get a report of that? “A Mr. Reese called me and told me that somebody put too much grease on the switch or too much oil on the switch at Woodstock, to check it.
“Q But did you find oil on it?
“A I found grease on it, not oil but grease.
“Q Was it any kind of grease like you or someone else in the maintenance of way department would use on a switch? “A No.
“Q Had you ever seen grease like that out on a switch?
“A Never in my career, never on a switch stand.
“Q What did you do when you got to the switch?
“A We took rags, or paper towels really, and wiped the grease off and took gasoline and washed the switch stand down where there was no more evidence of grease on the switch stand.
“Q Did you see anything around the switch that would indicate to you how that grease got there?
“A We found an empty cartridge or tube, a paper tube about that long and that big around that you buy a cartridge of grease in. We found one of those and a newspaper with grease on it.”
It is axiomatic that an employer, in an FELA action, has the duty to exercise reasonable care in the workplace (Kum v. Stanfield, 111 F.2d 469 (8th Cir.1940)), and that this reasonable care standard translates into a duty of the railroad to provide its employees with a reasonably safe place to work.
“That rule is deeply engrained in federal jurisprudence. Patton v. Texas & Pacific Ry. Co., 179 U.S. 658, 664 [21 S.Ct. 275, 278, 45 L.Ed. 361] and cases cited; Kreigh v. Westing housed Co., 214 U.S. 249, 256, 257 [29 S.Ct. 619, 622, 53 L.Ed. 984]; Kenmont Coal Co. v. Patton, 268 F. 334, 336. As stated by this Court in the Patton case, it is a duty which becomes ‘more imperative’ as the risk increases. ‘Reasonable care becomes then a demand of higher supremacy, and yet in all cases it is a question of the reasonableness of the care — reasonableness depending upon the danger attending the place or the machinery.’ 179 U.S. p. 664 [21 S.Ct. p. 278]. It is that rule which obtains under the Employers Liability Act. See Coal & Coke Ry. Co. v. Deal 231 F. 604; Northwestern Pacific R. Co. v. Fiedler, 52 F.2d 400; Thomson v. Boles, 123 F.2d 487; 2 Roberts, Federal Liabilities of Carriers (2d ed.) § 807. That duty of the carrier is a ‘continuing one’ (Kreigh v. Westinghouse & Co., supra, [214 U.S. at] p. 256 [29 S.Ct. at p. 622]) from which the carrier is not relieved by the fact that the employee’s work at the place in question is fleeting or infrequent.”
Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444 (1943).
This interminable duty under the FELA to provide a safe place to work, while measured by foreseeability standards, is more expansive than the general duty to use reasonable care. Ragsdell v. Southern Pa *444 cific Transp. Co., 688 F.2d 1281 (9th Cir.1982).
Moreover, the foregoing authorities must be read in conjunction with 45 U.S.C. § 52, part of the Act itself. Section 52 provides in relevant part:
“Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.”
Although I agree with the railroad that the trial court did not err in submitting the contributory negligence issue to the jury, I do not agree that the “reduction of the damages” principle that applies under the comparative negligence doctrine is consistent with the award of damages of $1. One does not need the skill of a mathematician to know that $1 is so small a percentage of $30,000 (.0033%) as to render the jury’s finding of the comparative degrees of fault between these parties totally ridiculous.
Admittedly, it is a rare case when this Court should disturb a jury’s verdict. However, in my opinion, this is one of those rare cases, because the verdict is clearly inconsistent with the preponderance of the evidence. Given the jury’s finding of liability on the part of the employer and contributory negligence on the part of the plaintiff, all of the credible evidence points toward an award substantially greater than the $1 amount awarded. Indeed, the record reveals that, during summation to the jury, counsel for the railroad appropriately argued that the evidence of contributory negligence supported a diminution of the damages; and, accordingly, he suggested that, even if the jury found in favor of the plaintiff, its verdict for as little as $7,500 would be justified in light of the plaintiff's contributory negligence. My point is that not even counsel for the railroad dared to indulge in an argument so ridiculous as to suggest that the jury return a verdict for $1 in the event the jury should find for the plaintiff on the issue of liability.
Although I agree that the jury was justified in finding that Williams was guilty of contributory negligence, by the same token, given the liability of the defendant as found by the jury, I cannot agree that the jury’s verdict was consistent with the evidence presented. In short, “[ajfter allowing all presumptions in favor of its correctness, [I am] convinced that the evidence against the [award] is so decided as to clearly convince [me] that it is wrong and unjust.” Deal v. Johnson, 362 So.2d 214, 219 (Ala.1978).
Moreover, this case and the cases of Thompson v. Cooper, 551 So.2d 1030 (Ala.1989); Moore v. Clark, 548 So.2d 1352 (Ala.1989); and Clements v. Lanley Heat Processing Equipment, 548 So.2d 1345 (Ala.1989), are not distinguishable. Our “inconsistent verdict” holdings in those three recent cases — although decided in the context of the contributory negligence rule and involving verdicts for the plaintiffs and awards of $0 — require a similar holding under the facts of this case.
I acknowledge, of course, that, under the comparative negligence doctrine, a jury verdict for the plaintiff in an amount substantially less than the proved special damages would not be an inconsistent verdict as a matter of law. But where, as here, the undisputed special damages alone total in excess of $30,000 and the jury finds against the defendant on the issue of liability and awards the plaintiff $1 in damages, it is inconceivable to the rational mind that the verdict represents a reasonable apportionment of the fault as between these parties. Thus, I would hold that, under the facts of this case, the verdict was inconsistent and that the Court of Civil Appeals erred in not reversing for the trial court’s failure to set aside the verdict and order a new trial.
HORNSBY, C.J., and ADAMS, J., concur.